Cite as 2020 Ark. App. 2

# ARKANSAS COURT OF APPEALS
DIVISION II
**No.** CV-19-593

| | |
|---|---|
| LISA DOMINGUEZ<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | **Opinion Delivered:** January 15, 2020<br><br>APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72JV-18-142]<br><br>HONORABLE STACEY ZIMMERMAN, JUDGE<br><br>APPELLANT'S TERMINATION AFFIRMED; REMANDED FOR FURTHER PROCEEDINGS |

## RITA W. GRUBER, Chief Judge

Appellant Lisa Dominguez appeals the Washington County Circuit Court order that terminated her parental rights to her daughter, CD, who was born December 12, 2016. She does not challenge the statutory grounds for termination or the potential-harm or adoptability prongs of the best-interest determination. Her sole argument on appeal is that termination was not in CD's best interest because a less restrictive alternative for CD's placement was available. We affirm.

I. *Procedural History and Testimony*

This is not the first time the Arkansas Department of Human Services (DHS) has been involved with appellant. Her rights were terminated to three other children in 2016, and a protective-services case had already been opened on CD because she was born with THC in her system. In February 2018, appellant and her boyfriend (Colton Lamb) were in a car accident. CD, who was one year old at the time, was a passenger but was not injured

during the wreck. Hospital personnel contacted DHS when appellant had not sobered up after five hours. DHS exercised a seventy-two-hour hold on CD on February 4, 2018, and a petition for emergency custody and dependency-neglect was filed February 9, listing appellant as the mother and Javier Dominguez as the father in the caption.

The affidavit in support of the petition also listed Ronnie James Corter as a putative father. According to the affidavit, appellant was interviewed at the hospital and told the DHS worker that she married Javier because she "thought DHS wouldn't take [her] other kids away"; Javier is not CD's biological father and they never lived together as a family; Javier has never taken care of CD; and Corter is CD's father. The affidavit provided that during Javier's interview, Javier showed the worker CD's birth certificate and a marriage license that indicated he was married to appellant when CD was born. He was told that appellant claimed he was not CD's biological father, but he still indicated a willingness to care for CD. The affidavit stated that Corter had been contacted, and he was aware that appellant claimed he is CD's biological father, but he indicated that she refused his requests for DNA testing. The worker interviewed appellant again on February 6 when she was with her "paternal aunt and uncle Ruth and Terry Boldra,"[1] who said they were willing to help her "get on her feet."

The circuit court entered an ex parte order for emergency custody on February 9, noting that DHS had been involved with the family since 2015 and requiring them to provide the names, addresses, and phone numbers of all adult grandparents, relatives, and

[1]Appellant's maternal aunt and uncle are Ruth and Kevin Boldra. Terry Boldra is appellant's maternal grandmother.

legal or putative fathers of CD. A probable-cause hearing took place on February 14, which was attended by appellant, Javier, Corter, and the Boldras. A probable-cause order was entered on February 15, which ordered appellant to obtain and maintain stable housing, refrain from using illegal drugs, keep DHS up to date with current addresses and telephone numbers, maintain a clean and safe home for CD, resolve all criminal charges, and follow the case plan and orders. The order identified Javier as CD's "legal father" or "father." The court appointed counsel for both appellant and Javier; ordered DNA testing for Javier and Corter; ordered a home study to be conducted by DHS on Terry Boldra, CD's maternal great-grandmother, and if she did not pass the home study, DHS was ordered to begin the Interstate Compact on the Placement of Children (ICPC) process for Ruth and Kevin Boldra.

On March 9, the circuit court held an adjudication hearing, which was attended by appellant, Javier, and Franciso Saldaña-Gallardo, who was identified as a putative father. The court adjudicated CD dependent-neglected as a result of neglect and parental unfitness by appellant. It also found that Javier was not a fit parent for purposes of custody and visitation because he was "waiting on DNA to show paternity."[2] The goal of the case was set as reunification with a fit parent with a concurrent goal of adoption. Appellant was ordered to have a psychological evaluation, participate in counseling, submit to a hair-follicle test, and submit to random drug screens. Visitation was scheduled to occur twice a week under DHS supervision. DHS was ordered to start the ICPC on Kevin and Ruth.

---

[2]The order also provides that Corter's DNA results had been entered into the record. The results are not contained in the record on appeal.

A review hearing was held on August 8. The August 9 review order noted that the DNA test eliminated Javier as CD's biological father and ordered the circuit clerk to remove him from the case.[3] The circuit court found that appellant was still married to Javier and is CD's stepfather and that Javier had complied with all court orders and the case plan. The court authorized Javier to participate in the case plan and to attend visitation with appellant. The court continued the goal of reunification and found that appellant had complied with "some" of the case plan and orders but had been unable to attend all visitations, attend NA/AA meetings, participate in individual counseling, or complete a psychological evaluation.

The permanency-planning hearing was held on January 9, 2019, and the circuit court changed the goal of the case from reunification to adoption. The court found that appellant had not complied with the court orders and the case plan because she failed to maintain stable employment and housing, provide DHS with address and phone- number changes, submit to all random drug screens, attend NA/AA meetings, participate in counseling, and attend visitation with CD. Appellant missed two visits after the August review hearing and then went missing for two months, during which time she failed to attend visits with CD or contact DHS. Her last visit with CD was September 26, 2018. The court found that appellant had not made "measurable, sustainable, and genuine progress towards alleviating or mitigating the causes" of CD's removal. The court further noted that appellant's termination of her rights to three other children in 2016 as a result of illegal drug use and

---

[3]Javier was not listed in the case caption of the review order or subsequent court documents.

4

instability and failure to remedy these issues are the same issues that caused CD's removal. DHS was found to have made reasonable efforts to provide family services to finalize the permanency plan of reunification.

Regarding Javier, the court found that he had complied with most of the court orders and case plan but that it was not in CD's best interest to be placed with him because of the unstable relationship history between him and appellant. The order provided that they had separated five times since their July 2015 marriage and that Javier is not CD's biological father. Notwithstanding the court's finding that placing CD in Javier's care was not in her best interest, DHS was ordered to conduct a home study on Javier's home and circulate a copy to all attorneys and the CASA.

On February 12, DHS filed a termination petition against appellant and Brian Elliott, who was listed as CD's "legal father." The petition asserted that Javier is not the presumptive legal father of CD because appellant disclosed in her psychological evaluation that she was married to two men at once—Brian Elliott and Javier. Brian Elliott, whom appellant claimed she did not divorce before she married Javier, is the father of appellant's three older children. DHS asserted that Javier had no parental rights to divest. The termination petition did not name Javier as a parent, and he was not served with the petition, although he was represented by a court-appointed attorney.

At the April 2019 termination hearing, testimony was provided by a DHS family-service worker, appellant, Kevin Boldra, Terry Boldra, Javier, and CD's foster parent. The court accepted certified copies of the orders in CD's dependency-neglect case as well as the 2016 termination order providing that appellant voluntarily relinquished her rights to three

5

other children.[4]

Chris Hamby, a family-service worker in Washington County, testified that he had been the caseworker since January 2019. He testified that CD is a kind, loving, and affectionate three-year-old and is "very adoptable." Hamby indicated that several families were interested in adopting CD, and DHS was working towards that end.

Hamby testified that appellant failed to submit to regular drug screens and that the most recent had been positive for THC. He said that she had been unable to demonstrate an ability to protect CD and keep her safe from harm. He described appellant's history of starting services and then "vanishing," and "not receiving services, not working the case, and not complying with court orders." Hamby testified that DHS had not seen the consistency and stability needed for CD to return home and a return to appellant would not be in her best interest. Hamby asserted DHS's position that termination was the best option to establish permanency and stability in CD's life.

When questioned about Javier, Hamby stated that Javier had maintained communication with DHS, and Javier always expressed an interest in having CD placed with him. Hamby testified that he was uncertain whether Javier had any parental rights to CD but that DHS would like to continue to explore placement of CD with him.

Appellant testified that she married Brian Elliott in 2010, but they never turned in the marriage license to the Benton County clerk. She thought she was not legally married

---

[4]Brian Elliott's rights were involuntarily terminated.

to him.[5] She married Javier in 2015 before CD was born. They turned in the marriage license to the Washington County clerk the day the ceremony was performed. When questioned about placement for CD, she said she wanted CD to be placed either with the family that adopted her half siblings, Kevin Boldra, or another relative. She testified on cross-examination that she had no objection to CD's being placed with Javier.

Kevin Boldra, CD's great uncle, testified that he and his wife, Ruth, live in Colcord, Oklahoma, and they were interested in having CD placed with them and in adopting her. He explained that he knew CD had been in foster care since appellant's car accident, and he had been to hearings in CD's case but that he did not get in touch with DHS until the day of the termination hearing. He testified that he would now like DHS to conduct a home study.

Javier then testified that he considers himself a father figure to CD and that he would like CD to be placed with him. If CD was not placed with him, he believed that placement with Kevin Boldra would be best. He explained that he is still married to appellant; does not have any other children; was not born in the United States but had lived here for fourteen years; could not be deported; and was trying to get his resident card.

When asked for a recommendation, CD's attorney ad litem agreed with DHS that termination of appellant's parental rights was in CD's best interest. She asserted that Javier has no parental rights, and if he did have rights, she requested that they be terminated. The ad litem recommended that DHS conduct a home study on Kevin Boldra and that if the

[5]The circuit court relieved Elliott and his counsel as a result of appellant's testimony, finding he was not the legal father.

7

study was favorable, then it was in CD's best interest to be placed with the Boldras because they are CD's relatives.

At the close of the hearing, the circuit court found that DHS had proved both statutory grounds for termination and that termination was in CD's best interest by clear and convincing evidence. Specifically, the court explained that appellant had failed to maintain stability, comply with court orders, and remedy the conditions that caused removal despite meaningful efforts by DHS to rehabilitate her. With regard to Javier, the court found in its oral ruling that it was in CD's best interest for Javier's rights to be terminated if any existed. In the written order, the court stated that Javier "has no parental rights as to [CD]" on the basis of its previous finding that he is "neither the biological or legal parent of [CD]." Appellant timely appealed the termination order. Javier has not appealed.

## II.  *Standard of Review*

A circuit court's order of termination must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3) (Supp. 2019); *Martin v. Ark. Dep't of Human Servs.*, 2017 Ark. 115, 515 S.W.3d 599. Clear and convincing evidence is the degree of proof that will produce in the fact-finder a firm conviction of the allegation sought to be established. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 213, 40 S.W.3d 286, 291 (2001). On review, this court gives due deference to the opportunity of the circuit court to assess witness credibility and will not reverse termination unless the lower court's decision is clearly erroneous. *Posey v. Ark. Dep't of Health and Human Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm

conviction that a mistake has been made. *Chastain v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 503, at 7, ___ S.W.3d ___, ___. In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to judge the credibility of witnesses. *Id*. The appellate court is not to act as a "super factfinder," substituting its own judgment or second-guessing the credibility determinations of the circuit court; we reverse only in those cases in which a definite mistake has occurred. *Id*

In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing by clear and convincing evidence of one or more of the grounds for termination listed in Section 9-27-341(b)(3)(B).

## III. *Discussion*

On appeal, appellant does not challenge the statutory grounds and makes only a limited best-interest argument. She does not challenge the circuit court's findings of adoptability or potential harm but instead argues that the evidence failed to demonstrate that termination was in CD's best interest when a less restrictive alternative to termination was available. Arkansas Code Annotated section 9-27-329(d) provides that in initially considering the disposition alternatives and at any subsequent hearing, the court shall give preference to the least restrictive disposition consistent with the best interest and welfare of

9

the juvenile. Appellant contends that termination was premature when placement of CD with either Javier or Kevin and Ruth would have permitted a less restrictive alternative for permanency without destroying familial bonds. She relies on our recent decision *Clark v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 223, 575 S.W.3d 578, in support of her argument.

DHS contends that appellant is barred from arguing relative placement was a "least-restrictive" option because CD was not in the legal custody of a relative at the time of the termination hearing. DHS distinguishes *Clark* and contends that appellant lacks standing to challenge the termination of her parental rights based on alleged violations of Javier's parental rights.

CD's attorney says that relative placement was not in CD's best interest because no home study had been conducted on the Boldras, and there is no sibling group because CD has no legal siblings, unlike the situation in *Clark*.

Case law from this court holds that a circuit court is permitted to set termination as a goal even when a relative is available and requests custody. This is because the Juvenile Code lists permanency goals in order of preference, prioritizing a plan for termination and adoption unless the juvenile is already being cared for by a relative, the relative has made a long-term commitment to the child, and termination of parental rights is not in the child's best interest. *Otis v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 28, 538 S.W.3d 870. Our decision in *Clark* did not change this. *E.g.*, *Everly v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 528, ___ S.W.3d ___ (terminating mother's rights furthered the statutory goal of permanency even when child was already in a stable placement with paternal grandparents).

10

In *Clark*, we reversed the termination order acknowledging the statutory preference that a juvenile be placed with a relative in dependency-neglect cases. *Clark*, 2019 Ark. App. 223, at 14–15, 575 S.W.3d at 586–87. Additionally, we said that each termination-of-parental-rights case is decided on a case-by-case basis, and the circuit court's decision to forgo relative placement as a permanency goal for the children was clearly erroneous given the facts. *Id*.

The permanency-planning goal in *Clark* was set as adoption and reunification. In the present case, the circuit court changed the goal from reunification to adoption in the permanency-planning order. Like the maternal grandparents in *Clark*, the Boldras knew CD was in foster care from the beginning. However, unlike the grandparents in *Clark*, the Boldras did not express an interest in custody until the termination hearing. The court's probable-cause order lists the Boldras as being present, and the court ordered DHS to "start" an ICPC home study for the Boldras in the adjudication order. The court report noted that the Boldras declined the offered ICPC home study. Further, Kevin testified that he had not seen CD since the car accident in February 2018.

To the extent appellant argues that the court erred by terminating her rights on the basis of a potential placement with the Boldras, we disagree. The relative preference outlined by the legislature must be balanced with the individual facts of each case. In contrast to *Clark*, no relatives had been approved for placement at the time of the termination hearing. The Boldras declined the court's initial offer of an ICPC home study and did not seek placement until the termination hearing. Considering the facts of this case, we cannot say

11

that the circuit court clearly erred when it determined that terminating appellant's rights was in CD's best interest.

Appellant also argues that termination of her parental rights cannot be in CD's best interest because the court ignored Javier's rights as CD's parent. She contends that the court mistakenly dismissed Javier from the case, that he is a parent under the Juvenile Code, and that his rights had not been terminated.[6] DHS counters that appellant does not have standing to make this argument, citing *Cole v. Arkansas Department of Human Services.*, 2018 Ark. App. 121, 543 S.W.3 540. We agree that appellant lacks standing to make this argument. In *Cole*, we stated that Cole lacked standing to challenge the termination of her parental rights as a result of alleged violations of the legal father's rights, which were also terminated. *Cole*, 2018 Ark. App. 121, at 7, 543 S.W.3d at 544. The fact that the legal father's rights in *Cole* had also been terminated is not dispositive. The termination statute clearly contemplates the termination of only one parent's parental rights when it is in the child's best interest. Ark. Code Ann. § 9-27-341(c)(2); *see Griffin v. Ark. Dep't of Health & Human Servs.*, 95 Ark. App. 322, 326, 236 S.W.3d 570, 572–73 (2006). Having reviewed the facts in this case, we cannot say that the circuit court clearly erred in finding that termination of appellant's rights was in CD's best interest simply because Javier's rights—or any other legal or putative father's rights, if any—had yet to be determined.

To be clear, we affirm the termination of appellant's parental rights. However, this does not mean that CD is ready for adoption. Due to the unique circumstances of this case, an adoption for CD is premature as a result of the unresolved paternity issues—identification

---

[6]As noted above, Javier has not appealed.

12

of the true biological father and any rights of a legal father. The circuit court must decide these issues and appropriately consider termination of any rights they may have to achieve the permanency that CD is entitled to receive. The concurring opinion addresses more fully these hanging issues.

Appellant's termination affirmed; remanded for further proceedings consistent with this opinion.

VIRDEN, J., agrees.

HARRISON, J., concurs.

**BRANDON J. HARRISON, Judge, concurring**. I join the majority opinion because I agree that Lisa Dominguez's parental rights to CD may be terminated. I part company with the majority in other respects, including which facts to include in the narrative of this case's course. Below is my view of the case and, in particular, an error that prevents this child from being adopted at this point in time.

The deep import of this appeal is that a potential parent's rights—Javier Dominguez's rights to CD—have not been properly and fully adjudicated by a court of competent jurisdiction and pursuant to proper legal process. Javier may well be a parent by statutory definition given the facts in this case. According to the record and the circuit court's findings, he was married to Lisa when CD was born. Consequently, the most pressing concern is not that Lisa's rights were terminated—she concedes that grounds to terminate her rights exist. The main problem is that the termination order cleared CD for adoption although Javier's parental rights have not been adjudicated. I therefore also agree that this case should be remanded for further proceedings.

I. *Case History & Testimony*

The circuit court held many hearings throughout this case's course. I will concentrate primarily on the termination phase, but some case history is required to make the points fully. The court orders that preceded the hearing on DHS's petition to terminate Lisa's parental rights were accepted as evidence during the termination hearing.

In February 2018, the circuit court ordered DHS to arrange and pay for Javier to be DNA tested to determine his biological relation to CD. The court also ordered DHS to "start ICPC [Interstate Compact on the Placement of Children] [home study] on Kevin and Ruth Boldra."

The Boldras are CD's maternal great uncle and great aunt. The Boldras, Javier, and Lisa were present at the probable-cause hearing in February 2018. The record also reflects that Javier and Lisa were at the adjudication hearing a few weeks later. Javier is identified as CD's "father" or "legal father" in the probable-cause and adjudication orders. Two other men—Ronnie Corter and Franciso Saldana-Gallardo—were identified as putative fathers of CD in the March 2018 adjudication order. These early orders were entered more than one year before the case moved to termination.

An August 2018 review order entered during the middle of the case states, "Circuit Clerk shall remove Javier Dominguez as father. DNA test shows he is not father." The case caption in the August order identifies Javier as "step father." The order also states (with emphasis):

> The court finds that Javier Dominguez is not the biological father, and, thus, not the legal father of [CD]. He is authorized to participate in the case plan, as [CD] sees him as a father. *Javier Dominguez is still married to Lisa*, so he is the step-father to [CD].

14

The circuit court further found that Javier had complied with all court orders and the case plan, and he was permitted to visit CD.

In January 2019, the circuit court convened a permanency-planning hearing. Javier and Lisa were there. The circuit court changed the case-plan goal from reunification to adoption. It found that Lisa went missing for two months of the case, that she had not complied with many of the court-ordered tasks, and that she had not made measurable, sustainable, and genuine progress toward reunification with CD. The court found that Javier had complied with most of the court orders and case plan. The permanency-planning order states (with emphasis):

> The testimony today is that Javier and Mother were on "and off" before [CD] came into care and separated three times since [CD] was born. Ms. Collins testified that Javier was not present in the home during the PS case that opened for [CD] in 2016. The Court finds that it is not in the best interest to place with Mr. Dominguez, as who knows [what] would happen, he may get back with Mother given their relationship history! Mr. Dominguez has not demonstrated stability or the ability to protect her and keep her safe from harm as he is still married to Mother, they've been separated five times *since their marriage in July 2015*, and it is not stable to return [CD] into the on-off again relation between Mr. & Mrs. Dominguez. The Court notes that while married, Mrs. Dominguez was impregnated and had [CD] by a man—mom says she doesn't know who the father is for [CD]. DNA testing shows Javier Dominguez is not the bio. father of [CD]. So mom was having sex while married as she doesn't know who impregnated her.

The court also noted in its permanency-planning order that Lisa and Javier were married in July 2015 during the pendency of "the Benton Co. DHS dependent/neglect case so they should have resolved these issues by now and they haven't!" (Javier and Lisa were therefore apparently married when CD was born in 2016.) It ordered DHS to conduct a home study on Javier's home "and circulate a copy to all attorneys and CASA."

15

DHS filed a termination petition against Lisa and Brian Elliott. The petition identifies Brian Elliott as CD's "legal father." The petition alleged that Lisa never obtained a final divorce decree from Brian Elliott before she "purportedly married" Javier. The petition also alleged that Brian Elliott is not CD's biological father. Yet it states that CD "can best be served by terminating the parental rights of Brian Elliott, as he has not come forward seeking placement of [CD], and a Circuit Court has previously terminated his parental rights."

The termination petition did not name Javier as a parent or state any statutory grounds for termination against him; and DHS did not serve the termination petition on him.

The court convened the termination hearing in April 2019. Lisa, Javier, Kevin Boldra, and other family members appeared. An attorney represented Javier at the hearing.[1]

The DHS caseworker's report was admitted as State's exhibit No. 7. DHS recommended that CD remain in foster care and that the court terminate Lisa's *and* Javier's parental rights. A two-for-one attempt, in other words. The report stated that Lisa lives

---

[1]The termination-hearing transcript appears to reflect that Lee Linzay was court-appointed counsel for Javier during the hearing, although Javier was not identified as CD's parent in either the termination petition or the subsequent termination order. The record is unclear on when Javier was first represented by counsel, but it appears to be as early as perhaps the probable-cause hearing. There are no separate motions or court orders specifically addressing the appointment, or removal, of any attorney from the case, apart from the appointment of the child's attorney ad litem. *See* Ark. R. Civ. P. 64 (2019); Ark. Code Ann. § 9-27-316(h) (Supp. 2019). Nor, as I have said, did DHS serve the petition to terminate Lisa's rights on Javier. This fact is important because the DHS caseworker's report, which was admitted as State's exhibit No. 7 during the termination hearing, recommended that CD remain in foster care and that the court terminate Lisa's *and* Javier's parental rights.

16

with her mother and works part time. The report also states that Javier "lives in a one bedroom apartment in Prairie Grove where he has resided the last three years. He currently works for a construction crew." And "ICPC was declined by maternal aunt and uncle as they were allowing Lisa to reside in their home until she was able to get back on her feet."

The CASA report was admitted as ad litem exhibit No. 1. According to it, "[n]o appropriate family has come forward during this review period." The child's attorney, who had no contact with Lisa or Javier during the case, recommended that their parental rights be terminated.

The record contains a single drug screen, which concluded that Lisa "could not produce at the time of drug screen." A single DNA test result in the record shows a zero percent probability that Javier is CD's biological father.

During the termination hearing, DHS caseworker Chris Hamby testified that CD was "doing great" in foster care and is "very adoptable." He described Lisa's inconsistent and unstable behavior throughout the case and explained why it was not in CD's best interest to return to Lisa given her substance misuse. Several families were interested in adopting CD, and DHS was working toward that end. CD's foster parent testified at the hearing that the family was not interested in adopting CD but that she could remain in their home until an adoptive placement was found.

Caseworker Hamby testified that he had never contacted Brian Elliott but did speak with Javier. Hamby acknowledged that Javier "has always been interested in placement of this child with him[.]" The testimony was that Javier had been allowed to visit CD at the start of the case, but when Lisa's visits were discontinued, Javier's were also stopped. Hamby

admitted that no study had been done on Javier's home even though the circuit court had ordered one in its permanency-planning order. Hamby said, "[T]hat's definitely needing to happen." Hamby also said that Javier was willing to find a larger place to live and that his income could support such a move. Then came some questions about Javier's parental status:

HAMBY: [W]e would like to continue to explore that [placing CD with Javier] as an option.

LINZAY: Even though the Department is recommending termination for him?

HAMBY: Yeah. I mean, at this point it's—what his part of the case is, my understanding is—I understand he is not the biological father.

LINZAY: Right.

HAMBY: He is not the putative father. I don't know if there are rights to terminate—

LINZAY: —that's what I was wondering.

HAMBY: —given the situation. So I will defer to the Court on that but—

LINZAY: Whatever he is—

HAMBY: —assuming that the Court feels that it isn't any kind of violation or mis-interest of the child, we would certainly pursue it, yes.

Lisa testified during the hearing. She said that she married Brian Elliott in 2010, but they never turned in a marriage license to the Benton County clerk. Lisa said that she was never legally married to Brian Elliott as far as she knew. In July 2015, before CD was born, Lisa married Javier; they presented a marriage certificate to the Washington County clerk's

18

office the day the ceremony was performed.[2]  The court found that Lisa and Javier were still married when the termination hearing was held.  The circuit court relieved Brian Elliott's appointed counsel in the middle of the termination hearing given Lisa's sworn testimony that neither she nor Brian had given a marriage license to the Benton County clerk.  The court reasoned that Elliott is not CD's "legal father."

When asked by DHS's lawyer who CD should be placed with if CD could not be returned to her, Lisa said her first choice was that CD be placed with the Benton County family who had adopted CD's three half siblings.  Her second choice was Kevin Boldra or another family member.  Lisa identified Kevin Boldra as her uncle from Colcord, Oklahoma; he was present during the hearing.  On cross-examination, Lisa said that she would have no objection to Javier's having custody of CD and that his apartment would be appropriate housing for her daughter.

Kevin Boldra testified that he is the chief of police in Colcord, Oklahoma, and that Lisa is his niece.  Kevin's wife, Ruth, works for Teen Challenge in Disney, Oklahoma.  Kevin said that he had not been in contact with DHS before the termination hearing, but he knew CD had been in foster care since the 2018 car accident.  The last time he saw CD was the night of the car accident.  Lisa and her boyfriend had been at his house.  He asked DHS to perform a home study so that CD could be placed with him and Ruth.  Kevin said that he and Ruth wanted to pursue an adoption.

---

[2]"Return of the license is only evidence that a marriage has been performed and does not itself constitute the marriage."  *Fryar v. Roberts*, 346 Ark. 432, 441, 57 S.W.3d 727, 733 (2001); *see also Wright v. Vales*, 1 Ark. App. 175, 613 S.W.2d 850 (1981) (citing *DePotty v. DePotty*, 226 Ark. 881, 295 S.W.2d 330 (1956)).

CD's great-grandmother, Terry Boldra, testified that she would agree to assume temporary custody of CD but is too old to adopt a young child. She said that DHS conducted a home study, but she did not make enough money to qualify as a provisional placement for CD. Terry said that she would like CD to be with her brothers' adoptive parents so the siblings could all be together. On cross-examination, Terry said that CD had never met her siblings because she was born after Lisa's rights to the three siblings had been terminated.

Javier testified that he had lived in an apartment in Prairie Grove, Arkansas, for three years. When asked, "Did the Department of Human Services ever come to do a home study on your home?" Javier replied, "Just once." Javier considered himself to be CD's parent and said that he and CD had spent quite a bit of time together before she was removed from Lisa's custody. He also said that DHS did not allow him to visit CD after Lisa's visits were stopped and that he would like CD to live with him because he loves and misses her. Javier said that before CD was taken into DHS's custody, he supported CD and that he bought everything for her, including clothing and diapers. He worked a full-time construction job, did not have a drug or alcohol problem, and passed all drug screenings DHS administered. If CD could not be returned to her mother or placed with him, Javier wanted CD to go with Kevin Boldra. On cross-examination, Javier said that he had lived in the United States for fourteen years, has no children besides CD, that there was no chance he could be deported, that he was not born here, and that he was "trying to get [his] resident card."

The court heard closing arguments from the attorneys. DHS argued that Lisa's rights should be terminated and that Javier has no legal rights to terminate. Javier's attorney argued that even if Javier is not a legal father he is CD's stepfather and "de facto parent to this child." He argued that CD should be placed with him as a parent and that Caseworker Hamby's testimony supported his position because DHS admitted that it had not done the court-ordered home study. Lisa's attorney argued that Javier was CD's parent and that CD should be placed in his custody. She argued, in the alternative, that CD should be placed with the people who adopted Lisa's other children or with her uncle Kevin Boldra.

The attorney ad litem argued that Lisa's rights should be terminated and that Lisa is not legally married to Javier. Therefore, Javier had no parental rights and, alternatively, his rights should be terminated if he had them. The attorney ad litem recommended that DHS conduct an ICPC on Kevin Boldra and that if the study was favorable then it was in CD's best interest to be placed with the Boldras because they are CD's relatives.

The circuit court entered an order terminating Lisa's parental rights on 14 May 2019. The court found Lisa to be an unfit parent on the basis of several (unchallenged) statutory grounds. The court found that CD is adoptable and that termination of Lisa's parental rights was in CD's best interest. The termination order states:

> The Court finds that the mother is not fit or stable and has not maintained sobriety or stability. The mother has not demonstrated the ability to provide for [CD] as she has not maintained stable housing through the case. The mother's repeated arrests throughout this case, which largely stemmed from her illegal drug use, demonstrates that the mother cannot safely parent [CD]. The mother is clearly not in a position to take [CD] home today. The Court finds that continued contact with the mother or any putative parent would be detrimental to [CD]'s well being.
> . . . .

Pursuant to the provisions of Ark. Code Ann. § 9-27-341 the parental rights of Lisa Dominguez, as to [CD] are hereby terminated, and the Arkansas Department of Human Services is authorized to consent to the adoption of the juvenile without further notice to or consent of the parents.

. . . .

*The unrefuted testimony today is that the mother did not finalize her marriage to Brian Elliott.* As such the Court finds that he is not a parent of [CD] and has no parental rights to terminate.

*With respect to Javier Dominguez, this Court previously found that, based on genetic testing, that Javier Dominguez is neither the biological or legal parent of [CD] as such he has no parental rights as to [CD]. Mother is the only legal parent to [CD].*

. . . .

The Court declines to place [CD] with her step-father, Javier Dominguez, as the evidence shows that he and mother have historically had an "off-and-on" relationship with each other. The Court finds that the potential harm in placing [CD] with Javier is too high, and not in her best interest[.]

The juvenile shall not be moved without a court order.

DHS shall conduct an ICPC home study on Kevin Boldra and Ruth Boldra.

[CD] is not authorized to be moved to a pre-adoptive home until a home study is completed on that home.

Lisa has appealed the court's termination order. She did not designate its permanency-planning order in her notices of appeal.

## II. *The Circuit Court's Half Right, Half Mistaken Decision*

Lisa argues that her child's other parent is Javier Dominguez and that it is in CD's best interest to be placed with him. In the alternative, Lisa says that it is in the child's best interest to be placed with her maternal relatives—the Boldras. Relatives, Lisa argues, are a preferred placement option at all phases in a dependency-neglect case, including termination. *Clark v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 223, 575 S.W.3d 578.

22

DHS contends that Lisa is barred from arguing that relative placement was a "least-restrictive" option available to the circuit court because CD was not in the legal custody of a relative when the termination hearing was convened. In DHS's view, the Boldras were an "option for future adoption," but Javier "wasn't even an option," so the circuit court's decision was not clearly erroneous. DHS says *Clark* is distinguishable from this case for several reasons and that Lisa "lacks standing to challenge the termination of her parental rights based on alleged violations of Javier's parental rights."

Here, CD's attorney says that being placed with relatives is not in her best interest because no home study had been done on the Boldras and there is no sibling group because CD is an only child, unlike the children in *Clark*. (This was not the argument made to the circuit court.) The attorney ad litem's appellate brief is silent as to CD's best interest as it relates to her other parent, Javier.

A.  The Circuit Court Did Not Err Related to the Boldras

Caselaw from this court holds that a circuit court is permitted to set termination as the goal even when a relative is available and requests custody. CD was not being cared for by a relative at any point during this case. She is three years old, and Kevin Boldra's testimony was that he had not seen her since the car accident in February 2018. The ICPC home study on the Boldras was not done before the termination hearing because they declined one, which is unlike *Clark* (where the relatives received a glowing report). And unlike *Clark*, CD's foster parent(s) were not interested in adopting her. The circuit court still seemed open to placing CD with the Boldras and had ordered a home study to be conducted posttermination. Terminating Lisa's parental rights would technically make the

Boldras legal strangers to CD because their relative status is derived from Lisa's parental rights. But this fact alone does not make the court's best-interest finding clearly erroneous given the record as a whole.

Here, it seems that the relatives (the Boldras) did not actively pursue placement until the termination phase was reached. They can be considered as a placement option posttermination—albeit on the same footing as any other preadoptive home—including CD's half siblings' adoptive parents. The most important consideration is that CD needs permanency and terminating Lisa's parental rights furthers that goal under the circumstances. Consequently, to the extent Lisa argues that the court clearly erred by terminating her rights based on a potential placement with the Boldras, I would affirm the court's decision on that point. The robust relative preference that the legislature has provided must still be balanced with the unique facts of each individual case. Given this record, I cannot say that the circuit court clearly erred when it determined that terminating Lisa's parental rights was in CD's best interest. I therefore join the majority opinion on this specific case-disposition point.

### B. The Circuit Court's Error Regarding Javier Dominguez and Its Best-Interest Analysis

As I have already recited, the circuit court concluded that returning CD to Lisa's custody posed a threat of potential harm to CD, so it was in her best interest to terminate Lisa's parental rights and achieve permanency for CD through adoption. That decision is not clearly erroneous. *See Harbin v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 715, 451 S.W.3d 231 (a mother's instability and drug use show potential harm to child). But even if custody cannot be returned to her, Lisa further argues here that "[i]t was absolutely contrary

to the tenants [sic] of the Juvenile Code to terminate Lisa's rights and mistakenly dismiss Javier as a step-father when CD's parent, Javier, was in a position to care for her."

DHS argues—and my colleagues agree—that Lisa does not have standing to make this argument under *Cole v. Arkansas Department of Human Services*, 2018 Ark. App. 121, 543 S.W.3d 540. In *Cole*, we held that a mother lacked standing to challenge the termination of her parental rights on the basis of alleged violations of a father's parental rights, which were also terminated, and the decision about the father was not appealed. Here, however, Lisa argues that her child has a parent whose rights have not been terminated, and it is in her child's best interest to be placed with him.

Arkansas law plainly states that a circuit court must consider whether "returning the child to the custody of the parent, parents, or a putative parent or parents" is in the child's best interest. Ark. Code Ann. § 9-27-341(b)(3)(A)(ii) (Supp. 2019). Here, the circuit court clearly erred when it determined in its termination order that Javier is not a parent under Arkansas law:

> With respect to Javier Dominguez, this Court previously found that, based on genetic testing, that Javier Dominguez is neither the biological or legal parent of [CD] as such he has no parental rights as to [CD]. Mother is the only legal parent to [CD].

Under Ark. Code Ann. § 9-27-303(40), a "'Parent' means a biological mother, an adoptive parent, or a man to whom the biological mother was married at the time of conception or birth or who has signed an acknowledgment of paternity pursuant to § 9-10-120 or who has been found by a court of competent jurisdiction to be the biological father of the juvenile[.]" The circuit court found that Lisa is CD's only parent. That finding was

25

clearly mistaken given the record presented. Whether a person is a "parent" by statutory definition is, simply put, a basic tenet in this area of law.

A man to whom the biological mother was married at the time of conception or birth is, by statutory definition, a parent. Ark. Code Ann. § 9-27-303(40); *see also R.N. v. J.M.*, 347 Ark. 203, 61 S.W.3d 149 (2001) (a child born of a marriage is legally deemed to be the legitimate child of both spouses). The circuit court found that Javier and Lisa were married in July 2015, which was before CD was born in December 2016. Lisa testified that they were still married when the termination hearing began. The circuit court found that Javier and Lisa married in 2015 and were still married in 2019. It made no contrary finding at any other point during the case. Consequently, Javier is a "parent" by statutory definition given the court's own findings. The legal presumption that a married man is the father of the child is "one of the most powerful presumptions in Arkansas law." *Leach v. Leach*, 57 Ark. App. 155, 158, 942 S.W.2d 286, 288 (1997). The presumption can be rebutted by clear and convincing evidence, Ark. Code Ann. § 16-43-901(d) (Repl. 1999), but only when doing so serves a child's best interest. *Leach, supra*; Ark. Code Ann. § 16-43-901(g)(2) ("The court shall consider foremost the interest of the child in making any determination hereunder and consider only testimony and evidence which will serve the best interest of the child in its findings pursuant to this section.").

There is a zero percent probability that Javier is CD's biological father. But biology is only one way that a man can be a "parent" under Arkansas law. There was evidence that Javier is a parent as defined by our termination statute. DHS even used "parents" *in the plural* in its petition to terminate Lisa's rights. DHS's court report referred to Javier as a

26

parent and recommended that the court terminate his rights. The circuit court even appointed Javier an attorney, a move that clearly indicates the court believed that he was a parent with weighty rights to protect.

I would hold that Lisa is not prevented from making her Javier relative-placement argument given the statutes and caselaw. The potential harm to CD that Lisa argues—that CD is harmed by a deprivation of a relationship with Javier—reasonably relates to CD's best interest, which is the core point in these cases. True, Javier's rights as a parent are independent from, not derivative of, Lisa's rights. But I see no persuasive legal reason why Lisa cannot argue in this termination case, *as part of a best-interest analysis*, that her child should be placed with a parent who has never been declared unfit and who has never had his parental rights terminated in a petition that named him as a party and proceeded to an adjudication in accord with proper process. Indeed, the court mistakenly decided that Javier is not a parent to CD.

In *Howerton v. Arkansas Department of Human Services*, 2016 Ark. App. 560, 506 S.W.3d 872, this court, in a divided opinion, held that terminating the parental rights of a mother's husband to a child—even though the mother's lover was found to be the child's biological father—was clearly erroneous. We reasoned that once the circuit court found that the lover was the child's biological father, "the circuit court effectively divested [husband] of all parental rights to G.E.; therefore, [husband] had no rights to G.E. that the circuit court could terminate." *Id*. at 11−12, 506 S.W.3d at 879. In CD's case, there is an unknown and absent biological father, which is not like *Howerton*. Here, the circuit court has never declared any man to be CD's biological father.

27

Javier testified that he provided for CD before she was taken into DHS custody, there was no order making him pay child support, and he visited her every time he could. The circuit court, however, did not at any time find that Javier was an unfit parent;[3] nor did DHS allege that he was unfit in a termination petition. The only evidence of Javier's fitness as a placement option is an inference that he is unfit due to the circuit court's finding that he had an on-and-off relationship with his wife. Arkansas law requires DHS to establish that a parent is unfit by proving at least one ground for terminating parental rights by clear and convincing evidence. *Pratt v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 399, at 12, 413 S.W.3d 261, 267. The record contains no proof that Javier consented to adoption. The proper legal process was not followed here on multiple levels.

## III. *Conclusion*

The termination order should be affirmed to the extent it terminated Lisa's parental rights to CD. But the case should be remanded for further proceedings because CD was erroneously cleared for adoption. Settling this facet of the case is required before permanency for CD can be achieved.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.

---

[3]Nor did the court find that Javier, as the presumptive legal father, was not the biological father and that CD's best interest could be served by terminating his parental rights. Ark. Code Ann. § 9-27-341(b)(3)(B)(iii).