Cite as 2021 Ark. App. 126

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-20-558

| | |
|---|---|
| ALAINNA KING | **Opinion Delivered** March 17, 2021 |
| APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, TENTH DIVISION |
| V. | [NO. 60JV-19-317] |
| ARKANSAS DEPARTMENT OF HUMAND SERVICES AND MINOR CHILD | HONORABLE JOYCE WILLIAMS WARREN, JUDGE |
| APPELLEES | AFFIRMED |

## N. MARK KLAPPENBACH, Judge

Appellant Alainna King appeals the July 2020 termination of her parental rights to her three-year-old daughter, RL. King contends that the circuit court clearly erred in finding that it was in RL's best interest to terminate her parental rights because placing RL with a relative was a less restrictive alternative to termination. We disagree and affirm.

The appellate court reviews termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Best v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 485, 611 S.W.3d 690. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to judge the credibility of witnesses. *Id.* An order

terminating parental rights must be based on a showing by clear and convincing evidence (1) of one or more of the statutory grounds for termination listed in Arkansas Code Annotated section 9-27-341(b)(3)(B) (Supp. 2019), and (2) that termination is in the best interest of the juvenile. *Id.* The best-interest inquiry requires the circuit court to take into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. *Id.*

King does not challenge the existence of statutory grounds on which to terminate her parental rights.[1] King does not challenge the circuit court's findings regarding RL's adoptability and whether returning her to King's custody would pose potential harm to RL. Instead, King makes a limited "best interest" challenge, contending that that there was a less restrictive alternative to termination that would preserve familial bonds. Specifically, King asserts that the evidence weighed in favor of custody being granted to RL's maternal grandmother. We disagree that King has demonstrated clear error in the circuit court's best-interest finding.

Arkansas Code Annotated section 9-27-329(d) (Supp. 2019) provides that in initially considering the disposition alternatives and at any subsequent hearing, the court shall give preference to the least restrictive disposition consistent with the best interest and welfare of the juvenile. A circuit court is permitted to set termination as a goal even when a relative is available and requests custody. *Best v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 485,

---

[1]The circuit court found two statutory grounds had been proved against King: (1) the failure-to-remedy ground and (2) the aggravated-circumstances ground. *See* Ark. Code Ann. § 9-27-341(b)(3)(B).

611 S.W.3d 690; *Dominguez v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 2, 592 S.W.3d 723. This is because the Juvenile Code lists permanency goals in order of preference, prioritizing a plan for termination and adoption unless the juvenile is already being cared for by a relative, the relative has made a long-term commitment to the child, and termination of parental rights is not in the child's best interest. *Id.* Each termination-of-parental-rights case is decided on a case-by-case basis. *Migues v. Arkansas Dep't of Human Servs.*, 2019 Ark. App. 439, 586 S.W.3d 221.

King does not dispute the findings that led to RL's removal from her custody and the reasons that she could not regain custody. RL, who was born in December 2016, is a medically fragile child, has Axenfeld-Rieger syndrome, is severely autistic, and is severely developmentally delayed; she has a seizure disorder, has a g-tube to meet her nutritional needs, and requires intensive personal care. RL was removed from King's custody in March 2019, when RL was two years old, and placed in the custody of the Arkansas Department of Human Services (DHS). The child's removal was prompted when King took RL to the hospital because she was running fever, coughing, and lethargic. Medical personnel observed that RL had extensive bruises, had head lice, and was significantly underweight. King did not know when, where, or who caused the non-accidental bruises on RL. King told hospital personnel that RL could tolerate substantial feeding by mouth, which was inaccurate. RL was hospitalized for failure to thrive and child maltreatment. After RL was taken into DHS custody, RL gained weight and recovered from her illness and bruising, although she will continue to need extensive personal care and attention for the rest of her life.

The goal of this case was reunification with the mother or obtaining RL a permanent custodian. King was living in squalor when DHS intervened, and it became clear that King could not or would not provide RL the extraordinary care that she requires. Over the next sixteen months of this DHS case, King demonstrated difficulty adequately caring for herself, much less a child, and King did not focus her available efforts on RL. King instead focused her attention on her boyfriend, who exhibited behaviors that were unsafe for RL. Although in the latter months King attempted to comply with the DHS case plan, King did not benefit from the services to an extent that she would ever be able to safely parent RL. King had only supervised visitation. In March 2020, the circuit court conducted a permanency-planning hearing, at which the goal was changed to adoption, permitting DHS to file a petition to terminate King's parental rights. At that hearing, the circuit court found that she was often resistant to learning better and safer methods to care for RL. King lacked insight and understanding of RL's complex and severe conditions or how to care for her.

The evidence at the termination hearing showed that RL could not be safely reunited with her mother, who was not a fit parent by any standard. RL's grandmother, Connie Breeding, lived in Texas and had a home study approved in May 2020, just before the termination proceedings commenced. Breeding had custody of RL's older sister (approximately age four), but Breeding did not have an established relationship with RL and had not visited her. Breeding's last visit with RL, which lasted a couple hours, was in late 2018. At the termination hearing, Breeding testified that RL needs to be with King, who loves RL very much. King's biological father, Donald King, lived in Louisiana, and he

expressed hope that King could be reunited with RL at some point in the future, perhaps three, four, or five years down the road.

RL was never placed in a relative's custody and remained in foster care throughout this case. RL's foster parents expressed desire to adopt her, and the adoption specialist found 168 potential adoptive placements for a child with RL's characteristics, which could additionally include a relative with an approved home study.

The DHS caseworker said that although King had received extra services and complied, she had made no progress and did not benefit from all the services. King was still living with her boyfriend, and she had recently been in an acute mental-health-care facility because she was suicidal. The caseworker initially recommended termination but during cross examination recommended that permanent custody be granted to the grandmother (Breeding). The caseworker's interaction with Breeding, however, was limited to two or three contacts, and the caseworker did not know if Breeding understood the severity of, or how to handle, RL's extensive needs. The caseworker acknowledged that maintaining family relationships is important but that permanency is the goal.

King acknowledged that she had emotional and mental issues that required medication and, for a while, inpatient treatment. King also had the same genetic disorder as RL, which King thought would enable her to help RL understand it as she got older. King believed that she had learned what was necessary to parent RL but that she could learn about RL's medical needs on her own. She thought she was ready to be reunified with her. King did not want her parental rights terminated, but she was agreeable with RL's being placed in Breeding's custody.

DHS and the attorney ad litem urged that King's parental rights be terminated, freeing RL up for adoption. The circuit court concluded that even though King loves RL, DHS had proved its case against King beyond clear and convincing evidence: "it's actually beyond a reasonable doubt that the grounds have been met and beyond a reasonable doubt that best interests have been met." The circuit court remarked from the bench that it was focused on RL's best interest, that "termination is the right thing to do," and that "permanent custody would not be it."

King contends that the best-interest analysis here was incorrect because a less-restrictive alternative could be achieved in placing custody of RL with her grandmother, who had custody of RL's sibling. Considerations in making a best-interest finding may include: the preservation of the children's relationship with a grandparent; the severance of child support from a parent; whether a less drastic measure could be employed such as a no-contact order or supervised visitation; whether continued contact with the parent would be beneficial to the children if or when the children are living with a relative and not in an indeterminate state that is working against them; and whether the children are living in continued uncertainty. *Phillips v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 383, 585 S.W.3d 703.

King asserts that her situation is like that in *Clark v. Arkansas Department of Human Services*, 2019 Ark. App. 223, 575 S.W.3d 578, in which we held that the circuit court's decision to forgo a relative-placement option in favor of termination was clearly wrong under the circumstances. We hold that the situation here is unlike that in *Clark*, in which the grandparents identified in that case had a longstanding relationship with the minor

children.  Breeding did not have a similar longstanding relationship with RL and had limited contact with RL both before and after RL was taken into DHS custody.

The relative preference outlined by the legislature must be balanced with the individual facts of each case.  *Dominguez*, *supra*. RL was never in a relative's custody, and there was no demonstration of a strong bond with the grandmother. Breeding is effectively a stranger to RL, RL has profound special needs, and there was no reasonable hope for King to be reunified with RL, which undercuts King's argument against terminating parental rights.  *See Brumley v. Ark. Dep't of Human Servs.*, 2015 Ark. 356; *Everly v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 528, 589 S.W.3d 425; *Cranford v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 211, 378 S.W.3d 851.

Considering the facts of this case, and given our high deference to the circuit court's determination of the evidence and the credibility of the witnesses, we cannot say that the circuit court clearly erred when it determined that terminating King's parental rights was in RL's best interest.  Accordingly, we affirm the order terminating King's parental rights.

Affirmed.

GRUBER and MURPHY, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Andrew Firth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor child.