Cite as 2023 Ark. App. 233

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-22-518

| | | |
|---|---|---|
| JESSIKA GOFORTH | | Opinion Delivered April 19, 2023 |
| | APPELLANT | |
| | | APPEAL FROM THE SEBASTIAN |
| V. | | COUNTY CIRCUIT COURT, |
| | | FORT SMITH DISTRICT |
| | | [NO. 66FJV-20-326] |
| ARKANSAS DEPARTMENT OF | | HONORABLE ANNIE HENDRICKS, |
| HUMAN SERVICES AND MINOR | | JUDGE |
| CHILDREN | | |
| | APPELLEES | AFFIRMED |

**KENNETH S. HIXSON, Judge**

Appellant Jessika Goforth appeals after the Sebastian County Circuit Court filed an

order terminating her parental rights to her children, Minor Child 1 (MC1) (DOB 12-26-16)

and Minor Child 2 (MC2) (DOB 02-19-19).  Appellant argues on appeal that (1) there was

insufficient evidence to support the statutory grounds for termination, and (2) there was

insufficient evidence that termination was in the best interest of her children.  We affirm.

I.  *Relevant Facts*

On September 28, 2020, the Arkansas Department of Human Services (DHS) filed a

petition for dependency-neglect.  In the affidavit attached to the petition, DHS explained

that the children lived with appellant and that appellant has a long history with DHS.  The

first non-court-involved protective-services case was opened after MC1 was born as a Garrett's

Law baby in 2016.[1]  Another non-court-involved protective-services case had been opened three years later on October 5, 2019, and was closed on June 30, 2020.  It was noted that appellant "did not complete the recommended treatment, Drug Screens, home visits, food assistance, and case worker services."  More recently, after DHS received a referral on September 4, 2020, with allegations that the children had inadequate food and were environmentally neglected due to appellant's substance abuse, it was discovered that appellant had very little food in the home and that there were concerns about appellant "co-sleeping" with her then one-year-old child.  She also tested positive for methamphetamine, amphetamine, and bupropion.  Although appellant submitted to three subsequent drug screens, each result was invalid because the samples did not register to the correct temperature.  DHS further noted that appellant was resistant to services and that appellant had been less than cooperative and failed to complete the recommended services in two previous non-court-involved protective-service cases.  As such, DHS requested that the circuit court compel appellant's cooperation and completion of the recommended services to ensure the safety of the children.

---

[1]Arkansas Code Annotated section 9-27-303(36)(B)(i) (Supp. 2021), also known as Garrett's Law, provides that "neglect" includes (a) causing a child to be born with an illegal substance present in the child's bodily fluids or bodily substances as a result of the pregnant mother's knowingly using an illegal substance before the birth of the child; or (b) at the time of the birth of a child, the presence of an illegal substance in the mother's bodily fluids or bodily substances as a result of the pregnant mother's knowingly using an illegal substance before the birth of the child.

Thereafter, DHS subsequently filed a petition for emergency custody and dependency-neglect on October 19, 2020, after DHS had removed the children from appellant's custody and exercised a seventy-two-hour hold. In the affidavit attached to the petition, DHS repeated much of the information that was already contained in the first affidavit but added the facts and circumstances that necessitated the petition for emergency custody and dependency-neglect. The affidavit explained that a family-service worker (FSW) made face to face contact with appellant on October 5, 2020, to explain the procedure and services available to appellant. After the FSW mentioned inpatient treatment, appellant indicated that she would not consider an inpatient-treatment program. Although appellant was offered transportation to a case staff meeting on October 16, 2020, appellant declined and drove herself in a car that she had borrowed from an acquaintance who is a felon, even though her license had been suspended. Appellant was drug screened that morning and tested positive for suboxone, for which appellant had a prescription. That said, the affidavit noted that appellant exhibited "some mannerisms that were concerning." Appellant spoke very quickly, and it was difficult to understand her. Appellant also continued to repeat that "she did not see how she was being noncompliant, despite it being repeatedly explained to her." Finally, DHS was notified on October 16, 2020, that appellant had missed her session visit with SafeCare and had already canceled the next scheduled visit. Therefore, on these facts, DHS removed the children from appellant's custody on October 16, 2020, at 2:30 p.m. "because [the] circumstances or conditions of Jessika Goforth presented an immediate danger to the health or physical well-being of the juveniles."

3

The circuit court granted the petition for emergency custody, finding that probable cause existed for the removal. A probable-cause order was filed on December 1, 2020. An adjudication hearing was held on December 9, 2020, and an adjudication order was filed four months later on March 25, 2021. The order specifically made the following findings:

4. The Court finds that the Department exercised a 72-hour hold on 10/16/2020 because of immediate danger to the health or physical well-being of the juveniles. The Arkansas Department of Human Services has been involved with the family since 09/04/2020 because of allegations involving the mother's substance abuse, inadequate supervision, co-sleeping with an infant, inadequate food, and environmental neglect. After unsuccessfully attempting to address the issues with the mother through a non-court involved case, the Department, on 09/28/2020, caused to be filed a Petition for Dependency/Neglect, while still attempting to assist the family without removing the juveniles from the home. The Department engaged the 100 Families Initiative to assist as well.

5. The mother continued to deny on-going drug abuse despite evidence to the contrary (including laboratory-confirmed tests positive for methamphetamines and other illegal substances) denied a need for in-patient drug treatment despite her years of substance abuse, did not sign up for SNAP benefits despite the Department's assistance, did not avail herself of HUD referrals, and would not even accept the offer of transportation to attend a staffing. Instead, knowing that she was driving with a suspended license, she borrowed a car and drove herself and her small child to the staffing. She refused to allow the Department to transport the juvenile back home at the conclusion of the staffing. The Department had arranged for Safe Care to provide in-home counseling and parenting training, but the mother was uncooperative and did not make herself or the juveniles available for the services. With ever growing concerns, and a knowledge of a history that included the mother absenting herself and her child from the Department's ability to provided services during a prior investigation, the Department exercised a 72-hour hold on the juveniles on 10/16/2020. The services offered did not prevent removal because Jessika Goforth was unwilling to accept them. The Court finds that the efforts made to prevent removal of the juveniles were reasonable based on the family and juvenile's needs.

. . . .

7. The Court finds by a preponderance of the evidence that the juveniles are dependent-neglected on the bases of parental unfitness as defined in the Arkansas

4

Juvenile Code and that the allegations in the petition are true and correct. The mother, Jessika Goforth, is the offender.

The goal of the case was set as reunification. Generally, appellant was ordered to cooperate and communicate with DHS; comply with the case plan; obtain and maintain stable and appropriate housing, employment, income, and transportation; complete parenting classes; undergo a psychological evaluation and complete any treatment recommended; stay clean and sober; submit to a drug-and-alcohol assessment and complete any treatment recommended; submit to random drug screens, hair follicle tests, and alcohol swabs; resolve all criminal issues; and to submit to a ninety-day hair follicle test prior to the next hearing. Appellant did not appeal from this order or its findings.

The circuit court held a review hearing on April 7, 2021, and an order was filed five months later on September 20, 2021. In its order, the circuit court noted that although appellant had tested positive for methamphetamine on December 4, 2020, she had not had any positive drug screens during the review period. Appellant had maintained her housing, but it was reported that appellant needed additional employment. Appellant's driver's license had been suspended, and she had been charged with driving on a suspended license at least nine times. She still owed significant fines and had served twenty-two days in jail during the review period for driving on a suspended sentence and for contempt of court after arguing with the district court. As such, the circuit court continued the goal of reunification but added a concurrent goal of adoption.

A permanency-planning hearing was eventually held on October 22, 2021, and a permanency-planning order was filed three months later on January 24, 2022. Regarding compliance with the case plan, the circuit court found the following:

(5) The Court accepted into evidence were the Department's court report prepared by Ashley Avery and a report from Guidance Center. The mother was discharged from the outpatient program on 08/12/2021 for non-compliance. The current recommendation is for residential treatment.

(6) . . . The mother has not made significant or measurable progress on her case plan. She has not complied with the court's orders. She has not diligently pursued reunification. The juveniles cannot be safely returned to her within a timeframe that is consistent with the juveniles' developmental needs.

. . . .

(13) Regarding compliance with her case plan, the mother has attended some of the parenting classes, but has not completed them. She submitted to her psychological evaluation and her drug and alcohol assessment but has not complied with the recommendations. She attended some co-occurring treatment through the Guidance Center but was discharged for non-compliance. She has not attended the residential treatment now recommended. She has maintained her housing but not in an appropriate condition. Her water was disconnected for several weeks during this review period. She has not maintained stable employment or income. She has failed to provide the Department with requested verification of her reported part-time employment for a towing company or verification of other income. She does not have a reliable means of transportation. She has been charged with "Driving on Suspended License" at least nine (9) times. She owes significant fines and frequently has warrants. The Department provides transportation for her to travel to visit the juveniles. There have been significant issues regarding her behavior and demeanor regarding the visitation, such as concerns that she sleeps during her visits or is otherwise inattentive. She has failed to attend two (2) scheduled hair follicle tests. The one she appeared for in May 2021 was positive for amphetamine, methamphetamine, opiates, morphine, and heroin. She requested a staffing during this review period, but when her attorney arranged it, she failed to attend. On or about 07/25/2021 she over-dosed on fentanyl. She has not rehabilitated herself despite the services offered by the Department.

6

It was at this hearing that the circuit court changed the goal to adoption. In addition to repeating the same orders as before, the circuit court ordered appellant to be candid with the service providers and provide DHS with recommended information, such as employment and income verification. She was also ordered to notify DHS of any significant changes or events, including the "make-up of the household." She was ordered to submit to a hair-follicle test prior to the next hearing, resolve all outstanding criminal matters, and address any warrants prior to the next hearing. Finally, the circuit court noted that appellant had requested that DHS consider placement of the children with maternal grandparents. As such, it ordered the following: "If the Department has contact information for these relatives and has not already done so, it should explore the appropriateness of such relatives. However, the juveniles are not to be moved from their current placement without prior court approval."

After the permanency-planning hearing but before the circuit court entered its permanency-planning order, the attorney ad litem filed a petition for the termination of parental rights on December 21, 2021. Regarding appellant, the attorney ad litem alleged the failure-to-remedy, other-subsequent-factors, and aggravated-circumstances grounds for termination under Arkansas Code Annotated section 9-27-341(b)(3)(B) (Supp. 2021). A two-day termination hearing was held on February 2 and 9, 2022.

At the termination hearing, DHS moved to join the attorney ad litem's petition to terminate appellant's parental rights, which was granted without objection. Additionally,

multiple exhibits, including previous orders, positive drug screens, reports, case plans, referrals, and active warrants, were admitted into evidence without objection.

The following additional evidence was introduced at the termination hearing. Recall, DHS had filed a petition for emergency custody and dependency-neglect on October 19, 2020. Chelsea Sewell, a DHS supervisor, testified that she and Ashley Avery, the caseworker assigned to appellant's case, had met with appellant on July 19, 2021. Ms. Sewell recalled that she had discussed the case plan with appellant, but she did not think the meeting was productive. She explained that appellant did not seem receptive to the information that was given to her. Ms. Sewell testified that appellant was told what was expected of her and about the services offered by DHS. A second meeting took place in September 2021 after appellant had not made "any real stable progress." Ms. Sewell recalled that the meeting was very "heated" and that appellant was angry and raised her voice several times. Appellant further threatened that she would call the central office. She accused Ms. Avery of not "doing her job" and stated that DHS "was just coming for her, out to get her." Ms. Sewell explained that, despite appellant's complaints, she knew that Ms. Avery was communicating with appellant as Ms. Sewell had been a part of many phone calls and staff meetings. Another staff meeting was held in January 2022; however, Ms. Sewell testified that appellant refused to provide much information at that time.

Jennifer Jackson, an advanced EMT for the Fort Smith EMS, testified that she had responded to a call at appellant's home on July 25, 2021. She found appellant in the bathtub half clothed and unresponsive. The stopper was in the bathtub, and the water was left on to

8

fill the bathtub. Ms. Jackson testified that appellant could have drowned if she had not responded in time. Ms. Jackson administered Narcan, and appellant eventually "came around." Appellant told Ms. Jackson that she had taken an opioid-related narcotic with some friends but refused any further treatment or transportation to the hospital. Ms. Jackson noticed drug paraphernalia in the bathroom.

Lacy Ellis, a mental-health professional employed by Western Arkansas Counseling and Guidance (Western Arkansas), testified that she is a licensed mental-health professional. The circuit court qualified her as an expert in the areas of mental health and substance-abuse disorder. Ms. Ellis testified that she had provided individual counseling sessions to appellant. Ms. Ellis explained that appellant completed a drug-and-alcohol assessment in January 2021. It was recommended that appellant receive outpatient treatment for twelve to sixteen weeks with "co-occurring outpatient treatment to address substance use issues." Appellant was diagnosed with "adjustment disorder, opioid use disorder, severe, and amphetamine-type substance use disorder, severe." Ms. Ellis explained that appellant missed seven individual sessions and that appellant indicated that she missed those sessions due to "transportation issues" and because she had been incarcerated for a few days after driving someone home from a bar even though her license had been suspended. Because appellant missed too many individual and group sessions, she was discharged from the program on August 12, 2021. Ms. Ellis testified that she had sent a letter to appellant's DHS caseworker, Ashley Avery, recommending that appellant attend a residential treatment facility because

9

outpatient treatment was not working and because transportation would no longer be an issue to her completing her treatment.

Ms. Ellis further testified that she is familiar with the outpatient program offered at Harbor House. She explained that Harbor House's program is different from Western Arkansas's program in that Harbor House does not have many licensed mental-health professionals and does not drug test but trusts patients to be truthful. She testified that, from her experience with appellant, she did not think an outpatient program "would have been a good idea" and "would have definitely recommended residential treatment." That said, she admitted that any treatment is "better than none at all when it comes to drug treatment."

Gigi Doraji, an adoption specialist with DHS, testified that, although she was not the adoption specialist assigned on this case, she had the occasion to observe one of appellant's visits with her children on June 23, 2021. She stated that appellant was still asleep when she had picked her up for the visit and that appellant slept in the vehicle on the way to the visit. She stated that during the visit, appellant kept falling asleep. She explained that the children would try to wake her up and ask for her attention, but she would be asleep. At one point, one of the children spilled a drink, and appellant had no idea that it had happened. Appellant complained that it was cold—even though it was June—and she "tucked" herself under a blanket. Pictures of appellant asleep under a blanket were admitted into evidence without objection. Ms. Doraji also was concerned that appellant did not bring any diapers or wipes to change the children's diapers, and even after the daycare provided them,

appellant changed her daughter's diaper standing up using a single wipe. She also improperly wiped from the back to front and used the same dirty wipe to clean her daughter's leg. The June visitation was the only visitation Ms. Doraji observed.

Leslie Stillman testified that she had worked for DHS for six months and supervised four of appellant's visits with her children. Ms. Stillman described two instances of appellant sleeping while being transported to visits. On January 12, 2022, appellant was not ready that morning and had told Ms. Stillman that she had just woken up after Ms. Stillman arrived to pick appellant up for a visit. Despite being told that they needed to leave by 7:15 a.m. to make the visit in time, appellant did not get into the car until 7:40 a.m. Again, appellant did not have any Pull-Ups or wipes with her, and appellant slept the entire way to and from the visitation. Appellant was able to visit only with MC2 since MC1 had been quarantined due to COVID-19 exposure. Ms. Stillman reported that appellant was agitated with MC2 because MC2 constantly asked to go to the bathroom. Although appellant had thirty minutes left of her visitation, she requested that the visit end early. On the way to drop appellant off, MC2 complained that she felt sick to her stomach and stated that she needed to "throw up." Appellant simply told her, "No, you're fine, there's nothing wrong with you, you're fine, you're fine." However, MC2 "threw up everywhere" when she was returned to her foster home.

A week later, Ms. Stillman picked appellant up for another visit. Appellant was dropped off by another vehicle and had told Ms. Stillman that she needed to brush her teeth, brush her hair, change her clothes, and prepare for the visit. Ms. Stillman observed another

11

man come out of the house and leave in a vehicle. After Ms. Stillman asked about him, appellant told her that the man's name is Steven and that he had been watching her dog while she was not at home. Appellant did not have Pull-Ups or wipes with her until Ms Stillman told her that she needed them. During the visit, appellant was having difficulty staying awake and fell asleep at times during conversations with the children. At one point when the children were running around playing, appellant told MC2 that if she did not come back to her, she would leave her, which cause MC2 to scream and cry. Despite appellant's behavior, Ms. Stillman stated that she did not believe appellant was under the influence of anything.

Forrest Lair, another DHS supervisor, testified that he interacted with appellant at one court hearing and one visit to appellant's home. He testified that appellant had expressed her desire for the children to be placed with the maternal grandparents. However, he explained that the maternal grandparents were not a good placement option and had already been rejected as a placement option because he did not believe they would pass a background check. He further explained that "there was a DUI/DWI from a TDM that was held at the beginning." He also stated that there had been concerns that the maternal grandparents had visited the children without DHS's knowledge when the children were placed with appellant's sister before being removed from that placement. Mr. Lair testified that the putative paternal grandparents had stated they were not interested in placement.

Yet another supervisor for DHS, Mindy Tuck-Duty, testified that she was responsible for keeping records up to date in this case. She explained that her first involvement with

appellant occurred on October 4, 2019. Ms. Tuck-Duty testified as to appellant's compliance in the protective-services case that began on that date. She testified that the case had been opened after appellant's boyfriend had left MC2 home alone. It was also discovered that appellant had "hydrocodone and methamphetamine in her system." DHS made a referral for inpatient treatment; however, appellant refused. DHS attempted home visits many times, but DHS could not find appellant. Appellant rejected the services offered to her. That said, DHS was finally able to meet with her and drug test her starting in January 2020. After she had no positive drug screens through June 2020, DHS closed that case. Ms. Tuck-Duty acknowledged that the circuit court ordered DHS to evaluate the grandparents as placement options after the permanency-planning hearing. However, she testified that DHS could not place the children with the maternal grandmother because she was under the influence of opiates when she attended a case staff meeting in the 2019 case and subsequently was stopped for driving while intoxicated. She did not have a copy of an official home study.

Ashley Avery, the current DHS caseworker assigned to the case, testified about the case history as already outlined. Ms. Avery expressed her concern that appellant did not have sufficient income to provide for her children's needs. Appellant had not provided any verification of her income despite Ms. Avery's requests. Appellant had claimed that she was working part time for Mr. Jackson; however, Mr. Jackson told Ms. Avery that appellant worked only as needed. She also expressed concerns with appellant's housing. She described appellant's previous home as dirty. Appellant did not have a vehicle or a driver's license.

13

However, appellant had been stopped and charged with driving on a suspended license nine times and owed significant fines. Ms. Avery testified that, although appellant had completed parenting classes, appellant failed to demonstrate the skills she had learned—she slept during her visits and did not have the appropriate items for her children. That said, Ms. Avery's primary concern was appellant's substance-abuse issues. Ms. Avery explained that appellant had not been forthcoming about her treatment. For example, appellant did not tell her that she had been discharged from outpatient treatment at Western Arkansas. Instead, Ms. Avery first learned of that fact when she received a call from appellant's counselor. Appellant did not tell her that she had relapsed in July 2021, but Ms. Avery was told about it from another person at the end of August 2021. When Ms. Avery confronted appellant and asked for her side of the story at that time, appellant denied that she had overdosed and instead stated that another friend of hers had a seizure that day. Ms. Avery testified that she had been unable to conduct regular drug screens for appellant. The last drug test she completed was a week before her testimony, and appellant tested positive for methadone. Ms. Avery explained that appellant had missed the last three appointments for a hair-follicle test, which were in August and September 2021 and January 2022. Therefore, the last hair-follicle test completed was in May 2021.

Ms. Avery discussed her recent visit to appellant's home. She testified that Mr. Sellers was present when she visited. Appellant told her at that time that Mr. Sellers did not live there and that they were not dating. However, Ms. Avery found the previously admitted love letter taped to the bathroom mirror, and there was a utility bill on the refrigerator that

14

reflected Mr. Sellers's name. When Ms. Avery instructed appellant to submit to a random drug test, appellant came out of the bathroom and said that she had dropped the cup in the toilet. Ms. Avery did not have another test to administer at that time.

Ms. Avery explained why neither the maternal nor the putative paternal grandparents were appropriate placement options. She explained that the maternal grandmother had attended a staff meeting under the influence in 2019 and was subsequently arrested for driving while intoxicated. She additionally was arrested for disorderly conduct in August 2021. Ms. Avery noted that there were other legal issues as well and that the maternal grandparents had been caught lying to DHS to protect their daughter. For example, the maternal grandparents had told DHS that appellant was in a treatment facility when appellant was not in a facility. As such, DHS could not recommend them as a placement option. Moreover, the putative paternal grandparents had said that they were not interested in placement.

In summary, Ms. Avery recommended that appellant's parental rights be terminated because she had not complied with the case plan and opined that adoption was in the children's best interest. She explained that appellant had failed to keep stable housing, income, and transportation. Appellant additionally had not resolved her legal issues. More importantly, appellant failed to show that she could remain free from substance abuse. Ms. Avery testified that she believed she had done everything within her power to make sure appellant had the tools available to be successful. However, appellant had continued to be

15

argumentative and noncompliant. Ms. Avery noted that the children's foster parents are interested in adopting the children.

Appellant testified on her own behalf and stated that DHS first intervened after MC1 was born. Appellant admitted that she had tested positive for methamphetamine and opiates at the hospital and that a protective-services case had been opened at that time. However, appellant explained that the case was closed a few months later. Appellant admitted that a second protective-services case was opened after her boyfriend had left her baby unsupervised at the home, and the case was subsequently closed several months later. Appellant further admitted that she had a positive drug test when her current case with DHS began, that she had driven with a suspended driver's license to a DHS staff meeting, that she had been cited for having a suspended driver's license seven or eight times, and that she had active warrants for her arrest. Although appellant had previously been ordered to resolve her legal issues, appellant acknowledged that she had not yet resolved those issues by the time of the termination hearing. Appellant also admitted dying her hair with a "three-wash shampoo color" despite the circuit court ordering her not to alter her hair because certain colorings can affect the test results of hair-follicle testing. Appellant also admitted missing her last scheduled hair-follicle test.

Appellant acknowledged that she had not completed her outpatient drug treatment at Western Arkansas and that she had been discharged for noncompliance because she had missed too many sessions. Despite her therapist's and the caseworker's recommendation for residential treatment at that time, appellant admitted that she told the caseworker that she

"preferred not to." After the permanency-planning hearing, appellant started another outpatient program at Harbor House and had been in the program for several months by the time of the termination hearing. She also "guess[ed]" that the last time she used any illegal drugs was when she overdosed in July 2021. Appellant further testified that she was working part time detailing and cleaning cars and babysitting part time. She had been evicted from her home for nonpayment a few months before the termination hearing. Thereafter, she lived with friends, and more recently, she was living in a duplex that she was renting from Steven Sellers. She explained that Mr. Sellers owns the duplex and that all utilities were still in his name. Appellant further explained that Mr. Sellers would work out of town for two weeks and then return and stay with her at the duplex for two days. Although appellant denied that she was in a relationship with Mr. Sellers, after she was confronted with a letter she had written to Mr. Sellers stating that she loves him and that was signed by her as his "girlfriend," appellant admitted that she had tried to be in a relationship with Mr. Sellers. She claimed that the relationship ended three weeks before the termination hearing.

On cross-examination, appellant testified that she completed her parenting classes on January 4, 2022. She also estimated that she had another three weeks left before her outpatient treatment program was complete. She claimed that she was making sufficient income from her part-time positions to meet her needs. She admitted that she missed the last scheduled drug screen in January 2022 and that it had been at least four or five months since she had been drug tested. When pressed, appellant further admitted that she did not

complete the drug screen that the caseworker requested of her the previous Friday because she had "dropped the cup in the toilet and [the caseworker] didn't have another cup."

Although appellant acknowledged that she had active warrants and a pending petition to revoke her suspended sentence for fraudulent use of a credit/debit card, she testified that she was working with a detective to resolve them and was not worried about being arrested "as long as [she] cooperate[d] with what they want[ed her] to do." She also acknowledged that she owed approximately six or seven thousand dollars in fines and bonds and that she would need to pay another eleven hundred dollars to have her driver's license reinstated.

Regarding her living arrangements, appellant clarified that Mr. Sellers would be away for "two weeks" and then would stay in her bedroom for "two weeks" while she slept in the children's room. She testified that if the children were returned to her, the children would have their own room, and she would sleep on the couch. Appellant denied knowing that Mr. Sellers also had active warrants for his arrest. Regarding transportation, appellant testified that Mr. Sellers and her employer would give her rides. She also had been provided with a bus pass.

On redirect, appellant testified that she did not believe her parents had been explored as a placement option even though she asked DHS to do so several times. Appellant eventually admitted that her mother had been arrested for driving while intoxicated and that she had been concerned about her mother overusing Xanax. However, appellant claimed that her mother had stopped using that medication over a year ago. That said, she admitted that her mother had outstanding warrants and that her mother had two separate cases

involving arrests for driving while intoxicated, one of them from 2019. Appellant testified that she did not feel comfortable with either her DHS caseworker or Ms. Sewell. In fact, appellant admitted that she did not feel like she could get help from anyone at DHS. She admitted that the longest period she had been sober since her children had been born was a year and a half. This time, she claimed she had been sober since July 2021, even though she had missed her drug-test appointments since that time.

Appellant's employer, George Jackson, testified that he had known appellant much of her life. He testified that he "sporadically" called appellant to detail cars for him and would pay her sixty-five dollars a car. He explained that he might call her "sometimes once a week, sometimes three times a week, some not at all for a couple of weeks." He also testified that appellant babysat his daughter at times.

At the conclusion of the termination hearing, DHS requested that appellant's parental rights be terminated, and the attorney ad litem agreed. Both argued that the evidence was sufficient to support all three statutory grounds and that it was in the best interest of the children to terminate appellant's parental rights. Appellant's counsel argued that the petition should be denied. Counsel explained that appellant had substantially complied with the case plan. Counsel additionally argued that DHS had failed to fully investigate the relatives and that a home study should have been completed for the maternal grandmother. The attorney ad litem disagreed that placement with the maternal grandmother was an appropriate option. She explained that, although the maternal

grandmother "may have a great house," that fact did not "override" the other concerning behaviors exhibited by the grandmother.

The circuit court orally ruled from the bench that it was granting the petition for termination of parental rights. The circuit court filed a written order terminating appellant's parental rights on June 1, 2022. The circuit court specifically found by clear and convincing evidence that all three grounds alleged in the petition against appellant supported termination and that it is in the best interest of the children to terminate appellant's parental rights. Relevant to our disposition of appellant's points on appeal, the circuit court made the following specific findings:

> 6. The Court has considered and reviewed all the evidence submitted and the testimony of the witnesses in this matter, and finds that the Department of Human Services has proven, by clear and convincing evidence, the following grounds for termination of parental rights pursuant to Ark. Code Ann. § 9-27-341:
>
> . . . .
>
> **C. That the parents have subjected the juvenile to aggravated circumstances in that there is little likelihood that services, continued services, or additional services to the family will result in successful reunification.**
>
> i. Family Service Worker Mindy Tuck-Duty testified to the mother's history with the Department, beginning with [MC1's] birth and stretching to the present. Ms. Tuck-Duty testified to several incidents of inadequate supervision by the mother where she allowed her children to be put at risk due to the partners that she has chosen to associate with. The Department tried on many occasions to offer services to help the mother, but the services either failed to produce results, or the mother refused them outright.
>
> ii. The Court is concerned about the instability of the mother's housing. After being evicted from her home in November 2021, the mother is now living with Stephen Sellers. Family Service Worker Ashley Avery testified that during a home visit on January 28, 2022, the mother was initially not at home. Ms. Avery

stated that she encountered a man named Caleb and Stephen Sellers, who appeared to be intoxicated. Ms. Avery further testified that she requested that the mother take a drug screen after showing up twenty minutes later. After visiting the restroom, the mother reported that she had accidentally dropped the test into the toilet and ruining it.

iii. The mother's income is suspect to the Court. The mother's testimony and the testimony of the witness, George Frank Jackson, were not consistent. Mr. Jackson testified that the mother worked on an "as-needed" basis. He testified that the mother would work one to three times a week, and that she had not worked for him in three weeks. The mother testified that she also babysat, but provided no verification of this.

iv. The Court is concerned that the mother cannot or will not rectify her issues with drugs and alcohol. Lacy Ellis of Western Arkansas Guidance and Counseling testified that the mother's last attendance in their program was on June 29, 2022. Ms. Ellis emphasized that the best course of treatment for the mother would be in-patient treatment. The mother has repeatedly refused in-patient treatment, and the mother testified that she felt in-patient treatment was not necessary. Since the Permanency Planning Hearing, the mother has completed parenting classes, and she has undergone counseling and some treatment at Harbor House, but the Court would note that Harbor House does not drug test participants or verify information provided by participant. The Court believes that the mother has little likelihood of overcoming her drug issues without proper in-patient treatment.

7. The Court finds by clear and convincing evidence that it is in the best interest of [MC1] and [MC2], to terminate the parental rights of Jessika Goforth. The risk of harm if returned to a parent is physical, emotional, and psychological.

8. In making this finding, the court specifically considered: (A) the likelihood that the juvenile will be adopted if the termination petition is granted and (B) the potential harm on the health and safety of the juvenile caused by returning the juvenile to the custody of the mother or placing her in the custody of her father.

A. Regarding adoptability, the Court finds that the juveniles are adoptable. The juveniles are doing very well with foster parents interested in adoption. Adoption is and has been the permanency plan. Mindy Tuck-Duty testified that the Department looked into the maternal grandmother, Paula Goforth, as a placement, but she was excluded by her criminal history and behavior during the course of the case, even getting a DUI charge after leaving a staffing with the Department. Family

Service Worker Forrest Lair testified that he communicated with Richard and Betty Hartsfield, who were at the time believed to be the putative paternal grandparents. Mr. Lair testified that they were uninterested with placement. Even though the juveniles are not placed with relatives, the children deserve permanency and it is in their best interest to be adopted rather than to be placed in the guardianship of relatives. The juveniles have no medical, behavioral, developmental, or other issues that would make adoption difficult or even challenging. Caseworker Ashley Avery testified that the juveniles are "adorable" and that there are over 200 data-matches to prospective adoptive parents if their current placement was to fail. The Court considered the evidence presented and has no concerns whatsoever that the juveniles are likely to be adopted. However, in the unlikely event that adoption is not imminent, the Court finds that the risk of harm the parents pose to the juvenile far outweighs any issue of adoptability.

B. Regarding risk of harm, the juveniles would be at risk of physical and psychological harm if returned to the parents. The mother's continued substance abuse issues and criminal behavior demonstrate the risk of harm she poses to the juveniles. The mother has testified that she is working with law enforcement as a confidential informant, and the Court has grave concerns with the company the mother would have to keep in order to do that work.

9. The Court finds that the following witnesses are completely credible in laying out the facts and circumstance of this case: Ashley Avery, Mindy Tuck-Duty, Leslie Steelman, Ghazal Doraji, and Forrest Lair from the Department of Human Services; Jennifer Jackson of Fort Smith EMS; Lacy Ellis of Western Arkansas Counseling and Guidance Center; and George Frank Jackson. The Court would state, based on the demeanor and the testimony of the mother, that the mother's testimony was not credible on many issues. The Court would also note that during the last hour and a half of the hearing, the mother had her eyes closed.

10. The Court, therefore, grants the Petition of the Department of Human Services and hereby terminates all parental rights between Jessika Goforth and regarding [MC1] and [MC2]. The Department is relieved of providing reunification services to the parents.

. . . .

13. The Court finds that Department has made reasonable efforts to finalize the juvenile's permanency plan and to provide reasonable and meaningful efforts to provide appropriate family services to the family. Despite these efforts and services, the juveniles cannot and should not be returned to or placed with the parent.

This appeal followed.

## II. *Standard of Review*

A circuit court's order terminating parental rights must be based upon findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Posey v. Ark. Dep't of Health & Hum. Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007). On appeal, the appellate court reviews termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*

In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in

23

section 9-27-341(b)(3)(B).  However, only one ground must be proved to support termination.  *Reid v. Ark. Dep't of Hum. Servs.*, 2011 Ark. 187, 380 S.W.3d 918.

The intent behind the termination-of-parental rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective.  Ark. Code Ann. § 9-27-341(a)(3).  Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child.  *Cobb v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 85, 512 S.W.3d 694.  Moreover, a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances.  *Id.*  Finally, a parent's past behavior is often a good indicator of future behavior.  *Id.*

### III.  *Statutory Grounds*

The circuit court granted the termination petition on the failure-to-remedy, other-subsequent-factors, and aggravated-circumstances grounds for termination under Arkansas Code Annotated section 9-27-341(b)(3)(B).  Although the circuit court found multiple statutory grounds for termination, only one ground is necessary to support the termination.  *See Reid*, *supra*.  Appellant argues that the circuit court erred in terminating her parental rights because there was insufficient evidence to support any of the grounds alleged in the petition to terminate parental rights.  We cannot agree and hold that there was sufficient evidence to support at least the aggravated-circumstances ground.

24

Arkansas Code Annotated section 9-27-341(b)(3)(B) defines the aggravated-circumstances ground as follows:

> (ix)*(a)* The parent is found by a court of competent jurisdiction, including the circuit court juvenile division, to:
>
> . . . .
>
> *(3)(A)* Have subjected any juvenile to aggravated circumstances.
>
> *(B)* "Aggravated circumstances" means:
>
>> *(i)* A juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been or is made by a judge that *there is little likelihood that services to the family will result in successful reunification* . . . .

(Emphasis added.)

Regarding the aggravated-circumstances ground, appellant argues that the evidence was insufficient to prove this ground. She claims that she "was sober, had a home, and had sufficient income." Although she acknowledges that she had made some mistakes and had prior DHS cases, appellant argues that this is the "first time" that she had been offered substance-abuse treatment. She further argues that since her relapse, she has "made concrete attempts to better her situation." We disagree.

Without repeating the voluminous evidence set forth above, the evidence reveals appellant has struggled with substance abuse at least since her eldest child was born. At that time, appellant tested positive for methamphetamine and opiates. Another protective-services case was opened in 2019 after appellant had left her child home alone with her boyfriend who then left the child alone when police came to talk with him. Ms. Tuck-Duty

25

testified that during the investigation, it was also discovered that appellant had "hydrocodone and methamphetamine in her system." Although DHS had made a referral for inpatient treatment, appellant refused and rejected other services that were offered to her. That said, after appellant finally submitted to drug testing and starting testing negative, the case was closed. However, appellant's sobriety was short lived as she again tested positive for drugs on December 4, 2020. Although she attempted outpatient treatment, she was subsequently discharged for noncompliance because she missed too many individual and group sessions. Thereafter, appellant overdosed and was found nonresponsive in her bathtub on July 25, 2021. Since appellant's relapse, she failed to submit to several drug screens. Further, appellant only recently started attending another outpatient program and had not completed that program as of the termination hearing. Moreover, Ms. Avery testified that appellant finally submitted to a drug test a week before her testimony at the termination hearing, and appellant tested positive for methadone.

In addition to her substance-abuse issues and despite her contention otherwise, evidence was presented that appellant does not have stable employment or housing that is sufficient to meet her children's needs. DHS still noted concerns with appellant's visits with her children, even though appellant had completed parenting classes. Moreover, even appellant admitted that she did not feel like she could get help from anyone at DHS, and Ms. Avery testified that she had done everything within her power to make sure appellant had the tools available to be successful. Under these facts, we cannot hold that the circuit court clearly erred in its findings, and we affirm the circuit court's aggravated-circumstances

26

finding. Because we conclude that DHS adequately proved the aggravated-circumstances ground, we need not discuss the remaining grounds found by the circuit court. *See Kohlman v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 164, 544 S.W.3d 595.

IV. *Best Interest*

In determining whether termination is in the best interest of a child, the circuit court must consider the entire history of the case and all relevant factors in the case, including the likelihood that the child will be adopted and the potential harm that would be caused by returning the child to the custody of the parent. *Foster v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 418, 559 S.W.3d 762. Adoptability and potential harm, however, are merely two factors to be considered and need not be established by clear and convincing evidence. In *Phillips*, we stated that some of the "[c]onsiderations in making a best-interest finding may include: the preservation of the children's relationship with a grandparent; the severance of child support from a parent; whether a less drastic measure could be employed such as a no-contact order or supervised visitation; whether continued contact with the parent would be beneficial to the children if or when the children are living with a relative and not in an indeterminate state that is working against them; and whether the children are living in continued uncertainty." *Phillips v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 383, at 12, 585 S.W.3d 703, 709–10.

Appellant does not challenge the circuit court's findings regarding adoptability. Thus, we need not consider that issue. *Yarbrough v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App.

27

429, 501 S.W.3d 839. Instead, she alleges that the evidence failed to establish that she posed such potential harm as to warrant terminating her parental rights. We disagree.

Although appellant did complete some of the case plan, appellant repeatedly tested positive for drugs since her eldest child's birth, and she failed to maintain stable employment and housing. In fact, even though she was finally attending an outpatient treatment program by the time of the termination hearing, she still had not completed the program. Although recent progress and efforts to comply in the months and weeks leading up to a termination hearing may and should be taken into consideration, it is not a bar to termination of parental rights when a parent fails to demonstrate an ability to remain sober in an unstructured environment for a significant period of time. *Moore v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 87. As such, appellant's behaviors over the course of the entire case as outlined above do not demonstrate sufficient stability to render the circuit court's finding that appellant posed a risk of potential harm to the child clearly erroneous.

Appellant also argues that termination was premature because DHS failed to sufficiently explore the children's relatives as a less restrictive alternative to termination as ordered by the circuit court in the permanency-planning order. She compares the facts of this case to those in *Clark v. Arkansas Department of Human Services*, 2019 Ark. App. 223, 575 S.W.3d 578, and *Borah v. Arkansas Department of Human Services*, 2020 Ark. App. 491. Again, we disagree.

We have previously explained that the State has an interest in finding a child an alternative permanent home when a parent cannot adequately provide one. Ark. Code Ann.

28

§§ 9-27-341(c)(3), -360.  And displaced children have a concurrent interest in preserving relationships that serve their welfare and protection.  *Clark, supra*.  Moreover, the General Assembly has enacted the policy that relatives are preferred when placing children in permanent homes.  *See* Ark. Code Ann. § 9-28-105 (Repl. 2020); *Clark, supra*.  Our supreme court has made it clear that the statutory preference that a juvenile be placed with a relative applies at all stages of a dependency-neglect case.  *Ellis v. Ark. Dep't of Hum. Servs.*, 2016 Ark. 441, at 10, 505 S.W.3d 678, 683; *see also* Ark. Code Ann. § 9-28-105.

Consistent with the premise of preserving family ties and relative placement, Arkansas Code Annotated section 9-27-329(d) (Supp. 2021) provides that in initially considering the disposition alternatives and at any subsequent hearing, the court shall give preference to the least restrictive disposition consistent with the best interest and welfare of the juvenile.  Our appellate courts have extended this least-restrictive-alternative consideration throughout the life of a dependency-neglect case and acknowledged that the least restrictive alternative is a relevant inquiry at a termination-of-parental-rights hearing.  *See Dominguez v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 2, 592 S.W.3d 723.  Because the rights of a relative, including a grandparent, to the extent the relative has rights, are derivative of the rights of the parent, we aptly noted in *Clark* that if a child is not placed with a grandparent prior to termination, "it is unlikely a court will allow them to adopt the children later."  *Clark*, 2019 Ark. App. 223, at 19, 575 S.W.3d at 589.

That said, case law from this court holds that a circuit court is permitted to set termination as a goal even when a relative is available and requests custody.  *Dominguez, supra*.

This is because the Juvenile Code lists permanency goals in order of preference, prioritizing a plan for termination and adoption unless the juvenile is already being cared for by a relative, the relative has made a long-term commitment to the child, and termination of parental rights is not in the child's best interest. *Id.* Our decision in *Clark*, a case in which we reversed the termination order acknowledging the statutory preference that a juvenile be placed with a relative in dependency-neglect cases, did not change this. *Id.* Instead, each termination-of-parental-rights case must be decided on a case-by-case basis. *Id.*

Here, the circuit court changed the goal from reunification to adoption in its permanency-planning order. Nevertheless, the circuit court specifically ordered the following: "The mother has requested that the Department considered placement of the juveniles with [the maternal grandparents]. If the Department has contact information for these relatives and has not already done so, it should explore the appropriateness of such relatives." At the termination hearing, testimony was presented that DHS had considered but dismissed both the maternal and putative paternal grandparents as placement options. Appellant argued at the termination hearing that DHS had failed to fully investigate the children's relatives and that DHS had not completed an official home study before rejecting the maternal grandparents as a placement option. However, in the termination order, the circuit court found that termination of parental rights was in the children's best interest. It noted that "Mindy Tuck-Duty testified that the Department looked into the maternal grandmother, Paula Goforth, as a placement, but she was excluded by her criminal history and behavior during the course of the case, even getting a DUI charge after leaving a staffing

30

with the Department." Additionally, testimony was presented that the putative paternal grandparents indicated that they were not interested in placement. Therefore, considering the specific facts of this case, we cannot say that the circuit court clearly erred when it determined that terminating appellant's rights was in the children's best interest. Accordingly, we affirm the order terminating appellant's parental rights.

Affirmed.

VIRDEN and THYER, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Casey D. Copeland*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.