Cite as 2025 Ark. App. 325

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-25-62

|  |  |  |
|---|---|---|
| | | Opinion Delivered May 21, 2025 |
| RECO SMITH | | |
| | APPELLANT | APPEAL FROM THE POINSETT COUNTY CIRCUIT COURT |
| V. | | [NO. 56JV-23-124] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | | HONORABLE CHARLES M. MOONEY, JR., JUDGE |
| | | AFFIRMED |
| | APPELLEES | |

**MIKE MURPHY, Judge**

Appellant Reco Smith appeals from the Poinsett County Circuit Court's termination of his parental rights to Minor Child (MC), born August 26, 2022.[1] On appeal, he argues sufficient evidence did not support the termination of his parental rights, challenging the circuit court's best-interest finding. We affirm.

The Arkansas Department of Human Services (DHS) has a history with this family. Most recently on July 19, 2023, DHS filed a petition for emergency custody and dependency-neglect of eleven-month-old MC alleging that she was dependent-neglected as a result of abuse, neglect, or parental unfitness. The circuit court signed an ex parte order for emergency

---

[1]Madison Biddle is MC's biological mother whose rights were also terminated. She is not a party to this appeal.

custody the same day. A probable-cause hearing was held on July 25. Smith had not yet been served. His demographic information was unknown to DHS at the time of removal because the biological mother was not cooperative in providing the information. The mother stipulated to and the court found probable cause for DHS to take emergency custody of MC and that probable cause continued to exist such that it was necessary and in the best interest of MC to remain in the custody of DHS. MC was adjudicated dependent-neglected on August 29 on the grounds of parental unfitness due to the mother's drug use.

A review hearing was held on December 5, 2023. Smith appeared via Zoom. DHS was found to have made reasonable efforts to provide family services and finalize a permanency plan for MC. Smith was found to be noncompliant with the case plan because he had been incarcerated throughout the case and unable to participate in services. DHS was ordered to assist in DNA testing to establish his paternity.

A permanency-planning hearing was held on July 16, 2024. Smith was found to be noncompliant with the case plan since he was still incarcerated and had been incarcerated since the beginning of the case. The goal of the case was changed to adoption following termination of parental rights with a concurrent goal of relative custody. DHS was ordered to investigate relatives identified by Smith at the hearing for possible placement.

On July 19, DHS filed a petition for termination of parental rights. A hearing was conducted on October 15. At the outset, the court entered an order declaring Smith to be the legal father of MC and establishing his paternity. DHS introduced three exhibits without objection, including two sentencing orders in criminal proceedings involving Smith.

2

Pertinent to the issue on appeal, testimony established the following. MC was now two years old and thriving in her foster placement. She is adoptable, and the foster family was interested in adopting her. DHS was unable to provide many rehabilitative services to Smith because of his incarceration. Smith was arrested on July 17, 2023, and had been incarcerated ever since. He was convicted of breaking or entering, a Class D felony, on August 31, 2022, and sentenced to a period of seventy-two months' probation. He was convicted of robbery, a Class B felony, on November 27, 2023, and sentenced to a period of thirty-six months' incarceration. He had not seen MC in more than twelve months, and he was uncertain MC was his child until the DNA test. Before his arrest, he was homeless and did not have stable employment.

As ordered, DHS investigated Smith's relatives for possible placement. Smith's mother, Lola Johnson Smith, was considered in April 2024 but was initially denied because she lived in a senior housing facility that did not allow children, she had a true finding on her record, and she did not have reliable transportation. She relied on the Medicaid van to transport her to appointments. Lola was provided with information on what she would need to correct to be reconsidered, and she had not fully made those corrections. The most significant thing she had left to do was secure appropriate housing. Lola was provided with a paper to complete and return to HUD, and as of the termination hearing, she had not returned it. Lola had never met MC, and according to DHS, she often could not recall MC's name.

Lola testified and acknowledged that she was living in a senior facility that did not allow children. She said she did not get the paperwork concerning assistance in housing that allows children until about a month before the hearing. She is diabetic and received a letter from her doctor saying she could take care of MC. Lola cared for her other grandchildren, and they occasionally stayed the night. She has several grandchildren, the youngest being several months old. Lola testified that she relies on her sons for transportation.

Mario Smith, a paternal uncle, was considered but not recommended. Before DHS submits a packet on a person to be considered for placement, it runs a search in its system and in CourtConnect. The search on Mario revealed that he had three prior true findings for sexual contact with a minor when he was sixteen years old. Mario also had three criminal convictions: a DWI from 2022; a charge for filing a false police report, careless and prohibited driving, and leaving the scene of an accident in 2021; and a theft-of-property charge in 2015. DHS did not believe Mario was an appropriate placement, so they did not submit a packet for further review.

Mario testified that he and his wife live alone. The children he helped raise are grown and out of the home. He has one minor child who is fourteen years old who lives out of state with her mother. He has grandchildren who stay with them on the weekends. His home has plenty of space and he has a stable job. Mario testified he and his wife have enough income to provide for MC. He testified that about three to four months before the hearing, he reached out to DHS about his desire to be considered as a placement for MC, but he had not followed up. He was not aware of the true findings against him because he thought an

investigation determined he was not responsible, and the charges were dropped. Mario acknowledged his criminal history pertaining to a hot check and two DWIs.

Anthony Smith, a paternal uncle, was also considered but not recommended. DHS's preliminary search found a true finding from 2009 for sexual penetration with a minor and a true finding from 2019 for a subdural hematoma and a bone fracture pertaining to one of his own children. Neither of the uncles had an established relationship with MC. Anthony did not testify.

At the conclusion of the hearing, the circuit court ruled that it was granting the petition and terminating Smith's parental rights to his child. Specifically, the circuit court terminated Smith's parental rights on three grounds: his failure to maintain contact or provide support, his substantial sentence in a criminal proceeding, and a finding of aggravated circumstances. The written order was entered November 18, and Smith filed a timely notice of appeal.

An order forever terminating parental rights shall be based on clear and convincing evidence of one or more grounds. Ark. Code Ann. § 9-27-341(b)(3)(B) (Supp. 2023). The circuit court must also find by clear and convincing evidence that termination is in the best interest of the child, including consideration of the likelihood that the child will be adopted if the termination petition is granted and the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A).

On appeal, termination-of-parental-rights cases are reviewed de novo. *Burks v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 309, 634 S.W.3d 527. Grounds for termination must be proved by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. *Id.* The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Bridges v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 50, 571 S.W.3d 506. In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses. *Id.* Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.*

Smith fails to challenge the circuit court's findings regarding grounds or MC's adoptability and whether returning her to his custody would pose potential harm. Rather, Smith makes a limited best-interest argument that the court erred in terminating his rights when a less restrictive alternative existed with his relatives. He has not demonstrated clear error in the circuit court's best-interest finding.

The law concerning this issue was addressed in *Goforth v. Arkansas Department of Human Services*, 2023 Ark. App. 233, at 28–29, 666 S.W.3d 138, 155–56:

We have previously explained that the State has an interest in finding a child an alternative permanent home when a parent cannot adequately provide one. Ark. Code Ann. §§ 9-27-341(c)(3), -360. And displaced children have a concurrent interest in preserving relationships that serve their welfare and protection. *Clark*, *supra.* Moreover, the General Assembly has enacted the policy that relatives are preferred when placing children in permanent homes. *See* Ark. Code Ann. § 9-28-105 (Repl. 2020); *Clark*, *supra.* Our supreme court has made it clear that the statutory preference that a juvenile be placed with a relative applies at all stages of a dependency-neglect case. *Ellis v. Ark. Dep't of Hum. Servs.*, 2016 Ark. 441, at 10, 505 S.W.3d 678, 683; *see also* Ark. Code Ann. § 9-28-105.

Consistent with the premise of preserving family ties and relative placement, Arkansas Code Annotated section 9-27-329(d) (Supp. 2021) provides that in initially considering the disposition alternatives and at any subsequent hearing, the court shall give preference to the least restrictive disposition consistent with the best interest and welfare of the juvenile. Our appellate courts have extended this least-restrictive-alternative consideration throughout the life of a dependency-neglect case and acknowledged that the least restrictive alternative is a relevant inquiry at a termination-of-parental-rights hearing. *See Dominguez v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 2, 592 S.W.3d 723. Because the rights of a relative, including a grandparent, to the extent the relative has rights, are derivative of the rights of the parent, we aptly noted in *Clark* that if a child is not placed with a grandparent prior to termination, "it is unlikely a court will allow them to adopt the children later." *Clark*, 2019 Ark. App. 223, at 19, 575 S.W.3d at 589.

Here, Smith and his relatives did not have a prior relationship with MC and had not spent any time with her. Smith was incarcerated throughout the entirety of the case and did not identify family members as a potential placement until about a year after MC had been taken into custody. While Smith concedes that Lola was denied placement due to her housing, he argues that his brothers were not truly considered or investigated. However, DHS conducted a preliminary investigation but declined to pursue these relatives further because of true findings for abuse or neglect.

He contends that his situation is akin to *Borah v. Arkansas Department of Human Services*, 2020 Ark. App. 491, 612 S.W.3d 749, where this court reversed and remanded a termination finding due to the circuit court's failure to consider placement with relatives. *Borah* is distinguishable.

In *Borah*, the evidence showed that the grandmother had made numerous attempts to become a placement option at various stages of the case over the course of several months before DHS took any action on her requests. Additionally, the grandmother testified that she had a good relationship with the child. In this case, there is no evidence of a preexisting relationship or demonstration of any type of bond and no indication that the relatives continued to reach out to DHS for placement. Also in *Borah*, the foster parents did not intend to adopt the child, whereas there was evidence here that the foster parents desire to adopt MC.

Considering the facts of this case and given our high deference to the circuit court's determination of the evidence and the credibility of the witnesses, we cannot say that the circuit court clearly erred when it determined that terminating Smith's parental rights was in MC's best interest.

Affirmed.

VIRDEN and BARRETT, JJ., agree.

*Elizabeth James*, Arkansas Commission for Parent Counsel, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

8

*Dana McClain*, attorney ad litem for minor children.